UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  00-6168-CR-HURLEY

UNITED STATES OF AMERICA,

       Plaintiff,

vs.

JEAN LINDOR,

       Defendant.

_____/

**SENTENCING MEMORANDUM AND OBJECTIONS TO THE PRESENTENCE
INVESTIGATION REPORT**

       Jean Lindor, through counsel, files this Sentencing Memorandum and Objections

to the Presentence Investigation Report ("PSI") and states as follows:

**I.**

**INTRODUCTION**

       Jean Lindor is a forty-four year old man who has led an exemplary life except for

his involvement in this matter.  Since both of his parents were killed in Haiti, Mr. Lindor

worked tirelessly to obtain an education, and provide for himself and his family.  PSI, at

¶¶ 59, 67.   At the time of the indictment, Mr. Lindor was employed full-time as a Metro-

Dade Correctional Officer, owned a small furniture store, and was employed part-time

by the American Redevelopment Corporation.  Id. at ¶¶ 74-77.  Mr. Lindor has been

married for more than twenty-years and has three wonderful children.  His wife and

family describe him as a good husband, a good father and a role model, and a man

*The Law Offices of Marc David Seitles, P.A.*

-1-

who is both "very caring" and "always willing to help others out." Id. at ¶¶ 58-59.  The

letters submitted to the Court support that Mr. Lindor is a man who has affected many

lives by his actions, all in positive and unique ways.

In sum, Mr. Lindor is a perfect example of why the Guidelines should be advisory

and not mandatory.  With the exception of this offense,  Mr. Lindor has been an a law-

abiding, hard-working, productive citizen of the United States.  He no history of any

arrests, traffic citations, drug use, violence or use of weapons.  Because of his unique

character and social history, and the nature and circumstances of this case,  Mr. Lindor

is deserving of a sentence below the advisory Guidelines range.

## II.

## OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

## PARAGRAPH 26 - THE OFFENSE CONDUCT

The PSI states that Mr. Lindor "referred potential borrowers to Cohen and

Silverman and was a paid a commission on each referral."  PSI, at ¶ 26.  Mr. Lindor

does not dispute that he was paid by defendants Cohen and Silverman for being part of

this illegal scheme by signing false employment verification forms and gift letters.

However, he seeks to inform the Court of his role in the offense conduct.

Mr. Lindor was paid $400 a week as a part-time employee of the American

Redevelopment Corporation.  He also received additional payments from defendant

Mark Cohen for fixing up homes that were sold to potential buyers, many of whom Mr.

Lindor knew personally.  Thus, Mr. Lindor was a low-level employee who was used as a

courier to pick up documents, send friends and family to ARC, translate for potential

clients, check on housing repairs, be a driver for potential buyers, etc.  It  is also important that the offense conduct reflect that Mr. Lindor did not know the financial situation of each person he referred to the American Redevelopment Corporation. Finally, Mr. Lindor's motive was not based on pure greed and malice.  Rather, his illegal conduct was  intended to help friends and family in the Haitian community to become home owners albeit with a company that he soon realized was committing fraud.

## PARAGRAPH 41 - SPECIFIC OFFENSE CHARACTERISTIC

The PSI enhanced Mr. Lindor two points pursuant to § 2F1.1(b)(1)(H) because the offense involved more than minimal planning; or a scheme to defraud more than one victim.  PSI, at ¶ 41.  Respectfully, this enhancement should not apply.

The commentary to the 1998 Federal Sentencing Guidelines explains that "more than minimal planning" means "more planning than is typical for the commission of the offense in a simple form."  See USSG § 1B1.1, Application Note, 1(f).  The Commission further explained that "more than minimal planning" is deemed present in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune.  Id.  The Eleventh Circuit has explained that this enhancement "is usually applied to sophisticated crimes or offenses requiring repeated acts over a period of time."  United States v. Tapia, 59 F.3d 1137, 1144 (11th Cir. 1995); United States v. Cropper, 42 F.3d 755, 758 (2nd Cir. 1994).  If the defendant does not "formulate a sophisticated plan or an elaborate scheme" or take steps to "conceal the crime" he should not be subjected to this enhancement.  Id.

Here, Mr. Lindor's acts were neither sophisticated nor elaborate.  Mr. Lindor did

not prepare the false verifications nor coordinate any of the fraudulent activities or set

up any of the fictitious companies.  Rather, he signed false documents and gift letters

on a number of occasions.  The remainder of his duties involved low-level tasks for the

corporation some of which were legal and part of his job responsibilities.  Mr. Lindor's

actions did not involve any planning, were over a short duration, and were directed by

his employers.  While Mr. Lindor wrongly acquiesced, his actions in the offense conduct

did not require more than minimal planning.[1]  Indeed, similarly situated defendants who

pled guilty in this case were not subjected to this enhancement.[2]  Thus, Mr. Lindor's

objection to § 2F1.1(b)(1)(H) should be sustained.

To the extent that the Court does not agree,  the Court should consider that the

"more than minimal planning" enhancement was deleted from the Guidelines in 2003,

and for equity reasons, should not apply it in this case.  See USSG, Supp. App. C,

amend. 617, p. 176.

Amendment 617 was enacted to "to obviate the need for judicial fact-finding

about this frequently occurring enhancement and to avoid the potential overlap between

the more than minimal planning enhancement and the sophisticated means

enhancement..." Id.  This amendment also "eliminate[d]" the alternative prong of the

"minimal planning enhancement" which provided a two-level increase if the offense

involved more than one victim.  The amendment replaced this enhancement with a

---

[1]  Here, the only victim in this case is the Department of Housing and Urban
Development.  See PSI, at ¶ 34 (victim impact).

[2]  Undersigned counsel was informed by USPO Tierney that this enhancement
was not applied to any of the defendants who pled and were sentenced in 2000.

specific offense characteristic for offenses that involved a "large numbers of victims." Specifically, if the offense "involved 10 or more victims" or "was committed through mass marketing, a defendant would be subjected to a two-level enhancement." Id. Because the Commission eliminated the more than minimal planning enhancement and the scheme to defraud more than one victim adjustment, the Court should exercise its' discretion post-Booker and not apply this enhancement to Mr. Lindor.

**PARAGRAPH 43 - ADJUSTMENT FOR ROLE IN THE OFFENSE**

Mr. Lindor cannot say that he was less culpable than most other defendants since many of the defendants played similar or analogous roles to Mr. Lindor. Therefore, he does not want to disingenuously argue for a mitigating role adjustment. Nevertheless, counsel has a duty to inform the Court that every other similarly situated defendant was granted a mitigating role adjustment at sentencing. While Mr. Lindor understands that many of these defendants were held responsible for larger amounts of money, he equally understands that many of these defendants were sentenced to no jail time and probationary sentences. To the extent that Mr. Lindor is compared only to defendants Cohen and Silverman, his employers and the only defendants to whom Mr. Lindor had significant contact, he was a clearly a substantially less-culpable offender.

**PARAGRAPH 45 - ADJUSTED OFFENSE LEVEL**

Without the two-point enhancement under § 2F1.1(b)(1), Mr. Lindor's adjusted offense level should be a 13.

**PARAGRAPH 48 - TOTAL OFFENSE LEVEL**

Without the two-point enhancement under § 2F1.1(b)(1), Mr. Lindor's total

offense level should be an 11.

### III.

### SENTENCING MEMORANDUM

As the Court is aware, district courts are now free from the mandatory nature of the Federal Sentencing Guidelines. United States v. Booker, 543 U.S. 220 (2005). See also United States v. Ranum, 353 F. Supp 2d 984 (E.D. Wis. 2005) (Adelman, J.) (holding that "*Booker* was not an invitation to do business as usual"). In fact, the Guidelines are not even presumptive, because "to treat the Guidelines as presumptive is to concede the converse, i.e., that any sentence imposed outside the Guideline range would be presumptively unreasonable in the absence of clearly identified factors . . . and making the Guidelines in effect, still mandatory." United States v. Myers, 353 F. Supp. 2d 1026 (S.D. Iowa 2005) (Pratt, J.). Instead, as Booker makes clear, the Court must consider all of the factors set forth in 18 U.S.C. § 3553(a), which provides that:

The court shall impose a sentence sufficient, but not greater than necessary. . . .

The court, in determining the particular sentence to be imposed, shall consider

(1)    the nature of the circumstances of the offense and the history and characteristics of the defendant;

(2)    the need for the sentence imposed –

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most

effective manner;

(3)      the kinds of sentences available;

(4)      the applicable category of offense committed by the applicable category
         of defendant as set forth in the Guidelines . . . .

(5)      any pertinent [Guidelines] policy statements . . . .

(6)      the need to avoid unwarranted sentencing disparities among defendants
         with similar records who have been found guilty of similar conduct; and

(7)      the need to provide restitution to any victims of the offense.

As one court put it: "The factors set forth in § 3553(a) f[a]ll into three general categories: the nature of the offense, the history and character of the defendant, and the needs of the public and the victims of the offense."  Ranum, 353 F. Supp. 2d at 990 (stating that courts should analyze each category, including the advisory Guidelines).

   A.      The nature of the offense

Mr. Lindor pled guilty to conspiracy to commit mail fraud, wire fraud and making a false statement to HUD.  Mr. Lindor entered into a plea agreement without the benefits of the full discovery process because he wanted to accept responsibility for his actions in a swift manner to put this difficult moment in his life behind him.  Because the Court must consider the nature and circumstances of the offense as it relates to Mr. Lindor it is important that the Court consider how and why Mr. Lindor got involved in this scheme.

Mr. Lindor met the two lead defendants, Mark Cohen and Eric Silverman, the same way many others in the Haitian community met them, with the hopes of owning a home.  At the time he was introduced to these men, Mr. Lindor was a hard-working

correctional officer who also owned a small furniture store with no knowledge of the real estate business. Eric Silverman seized on the opportunity to hire Mr. Lindor to help him and Mark Cohen in their real estate scheme because of Mr. Lindor's strong relationships within the Haitian community. Mr. Lindor was a low-level employee who was asked to participate in a fraud after several months with the company and wrongly did so by signing false employer references and gift transactions. Yet unlike the other defendants who were only motivated by greed, Mr. Lindor believed, albeit wrongly, that his actions would help other Haitians in his community become homeowners. Nonetheless, Mr. Lindor does not condone his actions and unequivocally accepts responsibility for the offense committed.

> B.     *History and character of the defendant*

Mr. Lindor has no prior criminal history, no arrests, and no history of any violence. He does not even have a traffic citation to his name. Mr. Lindor has worked tirelessly for his family and is a wonderful husband, father and role model. At the time of this incident he was working three jobs to support his wife and three children. Mr. Lindor served this community as a Metro-Dade Correctional Officer. He does not use drugs and is a very religious and spiritual man. He has been described as "very caring" and a man who "is always willing to help others out." In many respects, before this case, Mr. Lindor was a protype of the American Dream - a hardworking immigrant who started with nothing, who worked more than 18 hours a day with three jobs, who started his own small business, who raised and educated three children, and who became a role model for his family and friends.

Now, Mr. Lindor has lost his license to be a correctional officer, and will likely lose his real estate license.  Mr. Lindor endured almost one month in federal prison/county jail and hard-time in the Special Housing Unit where he was on lock-down for 23 hours a day.  Ms. Lindor has been forced to take a second job and Mr. Lindor's son, who is a straight-A student, has suffered academically and emotionally as a result of his father's current situation.[3]

The Sentencing Commission commissioned a report, "Measuring Recidivism." This report offers a statistical analysis of the type of person most likely and least likely to re-offend. The study demonstrates that the risk of Mr. Lindor re-offending is nil and also shows how important it is in this case not to impose a jail sentence. The study demonstrated that 1) those over 50 are less likely to recidivate than those under 50; 2) those who have not used illicit drugs are less likely to recidivate than those who did; 3)

---

[3] To the extent that the Court consider's Mr. Lindor's family circumstances extraordinary a traditional departure may be warranted.  See USSG § 5H1.6 (family ties and responsibilities); U.S. v. Norton, 218 F. Supp.2d 1014 (E.D. Wisc. 2002)(departure from 15-21 months to probation and home confinement granted to defendant convicted of credit card fraud observing that the Guidelines "do not require a judge to leave compassion and common sense at the door of the courtroom"); United States v. Dominguez, 296 F.3d 192 (3d Cir. 2002); United States v. Johnson, 964 F.2d 124 (2nd Cir. 1992); United States v. Pena, 930 F.2d 1486 (10th Cir. 1991); United States v. Canoy, 38 F.3d 893 (7th Cir. 1994).  A district court should not depart based on generic concerns about breaking up the family.  United States v. Wright, 218 F.3d 812, 815 (7th Cir. 2000).  Rather, it must be shown that "the period of incarceration set by the Guidelines would have an effect on the family and family members beyond the disruption to family and parental relationships that would be present in the usual case." Canoy, 38 F.3d at 907.  There is "no requirement that the circumstances be extraordinary by any particular degree of magnitude." Dominguez. 296 F.3d at 195. The district court should also consider whether the advisory Guidelines sentence range is sufficiently low that a reasonable departure to probation or home confinement could keep the family unit intact.  Wright, 218 F.3d at 815-16.

those who are or have been married are less likely to recidivate than those who have never been married; 4) non-violent offenders are less likely to recidivate than violent offenders; 5) first time offenders are less likely to recidivate than repeat offenders; 6) those who are employed are less likely to recidivate than those who aren't; and 7) those who are sentenced to non-jail sentences are less likely to recidivate than those who receive straight jail.  See  http://www.ussc.gov/publicat/Recidivism_General.pdf.

This study demonstrates something that common sense already dictates – Mr. Lindor will not re-offend. The only factor that this Court has any control over is the last factor – whether to impose a jail sentence or not. In this case, there is no reason to do so.  Every factor supports sentencing Mr. Lindor to an alternative form of punishment that does not include prison.  A prison sentence here benefits noone.

C.    The needs of the public and the victims of the offense

Because Mr. Lindor is an educated, non-violent, first-time offender with no history of any substance abuse and an excellent employment history, he is as much of a lock as there can be not to re-offend.  Mr. Lindor is also not a danger to society and he continues to contribute to society by maintaining full-time employment and supporting his wife and three children.  Mr. Lindor has already served almost one-month in a federal/county jail with two weeks in the Special Housing Unit. Mr. Lindor described his experience to counsel as "one of the worst in my life as I felt less than human."  Mr. Lindor was more than adequately punished through this form of incarceration and it will no longer serve the ends of justice to re-incarcerate a man where just punishment has already been meted out and where other kinds of sentences

are available to promote respect for the law.

    D.    *Need to Avoid Unwanted Sentencing Disparities Among Co-defendants*

Mr. Lindor was an employee of the American Redevelopment Corporation. He was directed to sign false landlord and employment references and assisted with conducting several gift transactions. PSI, at ¶ 26. He was only involved in six foreclosures with a total loss of $180,929.26. Id. As a result, he faces an advisory Guideline imprisonment range of 12 to 18 months. Id. at ¶ 87.

However, several co-defendants with greater roles in this scheme were punished far less severely. Indeed, many of whom did not serve one-day in federal prison.

- **Kenneth Heyder** was a licensed attorney and President of Security Title and Escrow who provided title commitments that were false and fictitious as to the true owner of record and who would conceal the immediate resale and inflate prices of the houses from lenders. PSI, at ¶ 26. He was responsible for supervising and managing all of the employees at Security, including defendants Kenneth Duquette and Annette Gonzalez. Defendant Heyder was sentenced to two years probation. Id., at p.2

- **Kenneth Duquette** was a marketing representative for Security Title and Escrow Company. He participated in 16 closings where had knowledge that these files contained false donor letters, false commitment letters, false Verification of Employment forms, false termite reports and false escrow letters. PSI, at ¶ 31. He was held responsible for a total loss of $297,366.54. Defendant Duquette was sentenced to three years

probation.  PSI, at ¶ 6.

- **Annette Gonzalez** was an employee of Security Title and Escrow. Her responsibilities included ordering title searches, typing title commitments, coordinating loan payoffs, ordering surveys, and typing escrow letters. She was involved in 16 loans and responsible for a total loss amount of $297,366.54.  PSI, at ¶ 32.  Defendant Gonzalez was sentenced to 18 months probation. Id., at ¶ 6.

- **Christie Galluci** was an independent contractor used by American Mortgage Institute, and prepared approximately 43 files for Eric Silverman, and created false verifications of employment and false gift letters.  PSI, at ¶¶ 16, 26.  She was held responsible for a total loss of $869,107.99.  Defendant Galluci was sentenced to three years probation, and 6 months home-confinement.  Id., at ¶ 6.

Other defendants that received a year and one-day were much more culpable that Mr. Lindor.

- **Eric Silverman** was one of the leaders of the conspiracy and the president of American Redevelopment Corporation.  PSI, at ¶ 23.  He assisted in getting buyers qualified and approved for FHA loans, and was equal partners with Mark Cohen, splitting all profits.  Id.  He provided false employment verifications, false letters of credit, and paid defendant Saltz for false pay stubs and signing false HUD 1 addendums.  Id.  Defendant Silverman was sentenced to a term of imprisonment of twelve-months and

one-day.

- **Jean Dufralessi** was a licensed real estate agent and the owner of Dufralesi Reality.  PSI, at ¶ 27.  He was responsible for falsifying verifications of employment, directing and arranging to have his friends act as employers of borrowers, and purchasing cashier's checks on behalf of gift donors with ARC money.  Id.  He was involved in 65 closings with a potential loss of $975,000.  Id.  Defendant Dufralesi was <u>sentenced to a term of imprisonment of twelve-months and one-day.</u>  PSI, ¶ p.2.

- **Lee Garber** was an employee of ARC.  He was responsible for interviewing potential borrowers, filling out loan application forms, requesting credit reports and obtaining MLS lists for homes in the borrower's price range.  PSI, at ¶ 30.  He assisted in providing gift funds to borrowers, filling out Verification of Employment forms containing false information and forging employer's signatures.  He was involved in 53 closings and a total loss attributable of $869,107.99.   Defendant Garber was <u>sentenced to a term of imprisonment of twelve-months and one-day.</u>  PSI, at ¶ 6.

Unlike the defendants below, Mr. Lindor was not in charge of nor directed the conspiracy, owned a company which profited from the conspiracy, or participated in fifty or so loans with a loss amount that exceeded $850,000.

In sum, the Court must consider the fact that defendants far more culpable than Mr. Lindor were sentenced to probation and home-confinement rather than federal

prison.  While some of these defendants cooperated with the Government and benefitted from substantial assistance reductions, the discrepancy between an advisory sentence of 12 to 18 months for Mr. Lindor and no prison time for many other defendants in this case does not fairly reflect equity in sentencing among similarly situated co-defendants particularly given Mr. Lindor's limited role in the conspiracy.

     *E.    The Advisory Guidelines*

     As explained above, the Court must consider a defendant's history and character and the advisory Guidelines.  The advisory Guidelines' range here is based on the amount of loss.  This artificial base offense level does not "consider" the individual defendant as a human being and therefore is only one component in determining what is a "reasonable" sentence.

     The Eleventh Circuit Court of Appeals has recently discussed what it means for the district court to "consider" the Guidelines.  In <u>United States v. Hunt</u>, No. 05-11671 (11th Cir., August 10, 2006), the Court held that a "district court may determine, on a case-by-case basis, the weight to give the Guidelines, so long as that determination is made with reference to the remaining section 3553(a) factors that the court must also consider in calculating defendant's sentence." <u>Id</u>, at 12.  The logic behind this decision is simple, if "<u>Booker</u> is to mean anything, it must be that district courts are obligated to impose a reasonable sentence, regardless of the Guidelines ranges, so long as the Guidelines have been considered." <u>Id.</u> at 10.  As a result, it is no longer the case that the Guidelines are presumptively reasonable in every case.  <u>Id.</u> ("In some cases it may be appropriate to defer to the Guidelines; in others, not"); <u>See</u> <u>also</u> <u>United States v.</u>

Talley, 431 F.3d 784 (11th Cir. 2005)("we reject the argument of the United States that a sentence within the Guidelines ranges is per se reasonable . . . Booker does not hold that a Guidelines sentence must conclusively be presumed to be reasonable.")[4] Morever, "[w]here a party challenges the Guidelines as imposing an unreasonable sentence because the range somehow over-or undervalues the need for punishment or general deterrence - propositions for which the Government is likely to have more information - a presumption in the defendant's favor may be more sensible." Hunt, No. 05-11671, at 12, fn.5.

Here, the Guidelines should be afforded much less weight given the history and characteristics of the defendant, the nature and circumstances of this particular offense, 18 U.S.C. § 3553(a)(1), the fact that the public does not need to be protected from the defendant who otherwise has no other criminal history, 18 U.S.C. § 3553(a)(2)(A), and the kinds of sentences available, including home detention and/or a community corrections center, 18 U.S.C. § 3553(a)(3).  Therefore, when imposing sentence, the Court should consider a sentence below the advisory Guidelines range in light of the factors set forth in 18 U.S.C. § 3553(a).  Hunt, No. 05-11671, at 12 ("Whether, after consideration of section 3553(a) in its entirety, a court finds the Guidelines to be compelling is a fact-specific judgment that we neither mandate or foreclose").

    F.    *Other Traditional Departures*

---

[4] Indeed, the scheme of downward and upward departures is now essentially replaced by the requirement that judges impose a "reasonable" sentence.  See United States. v. Mohamed, No. 05-50253 (9th Cir., August 11, 2006).  Formal departures have become anachronistic and deviations from the Guidelines range should be based on what the district court determines is a reasonable sentence.  Id.

1.    <u>Aberrant Behavior</u>

Although there is little need to discuss the traditional guideline departures after

<u>Blakely</u> and <u>Booker</u>, the departure issue is instructive because Mr. Lindor is the

prototypical candidate for a departure based on aberrant behavior.

Section 5K2.20, Aberrant Behavior, states:

**(a) IN GENERAL.**—Except where a defendant is convicted of an  offense
involving a minor victim under section 1201, an offense under section 1591, or
an offense under chapter 71, 109A, 110, or 117, of  title 18, United States Code,
a downward departure may be warranted in an exceptional case if (1) the
defendant's criminal conduct meets the requirements of subsection (b); and (2)
the departure is not prohibited under subsection (c).

**(b) REQUIREMENTS.**—The court may depart downward under this  policy
statement only if the defendant committed a single criminal  occurrence or single
criminal transaction that (1) was committed without significant planning; (2) was
of limited duration; and (3) represents a marked deviation by the defendant from
an otherwise  law-abiding life.

**(c) PROHIBITIONS BASED ON THE PRESENCE OF CERTAIN
CIRCUMSTANCES.** —The court may not depart downward pursuant to this
policy statement if any of the following circumstances are present:

(1) The offense involved serious bodily injury or death.
(2) The defendant discharged a firearm or otherwise used a firearm or a
dangerous weapon.
(3) The instant offense of conviction is a serious drug
trafficking offense.
(4) The defendant has either of the following: (A) more than one criminal history
point, as determined under Chapter Four (Criminal History and Criminal
Livelihood) before application of subsection (b) of § 4A1.3 (Departures Based on
Inadequacy of Criminal History  Category); or (B) a prior federal or state felony
conviction, or any other significant prior criminal behavior, regardless of whether
the conviction or significant prior criminal behavior is countable uder Chapter
Four.

Mr. Lindor nicely fits into the criteria set forth in subsections (a) and (b), and the

subsection (c) prohibitions do not apply. In fact, application note 3 under this Guideline

provision further explains that "in determining whether the Court should depart under this policy statement, the Court may consider the defendant's (A) mental and emotional conditions; (B) employment record; (C) record of prior good works; (D) motivation for committing the offense; and (E) efforts to mitigate the effects of the offense." Again, these  factors demonstrate that Mr. Lindor is entitled to such a departure. Without rehashing the facts as outlined above, Mr. Lindor has no history of mental or emotional problems, stable employment history which includes holding several full-time and part-time jobs to support his family, a motive that was not solely greed but rather to help other Haitians to become home-owners, and mitigation that includes foregoing the formal discovery process to plead guilty, cooperating with the Government and seeking to put this matter behind him in a quick and expeditious manner.  United States v. Garcia, 182 F.3d 1165, 1176 (10th Cir. 1999)(that defendant's crime was carefully planned" did not preclude finding of aberrant behavior because the correct focus is not on the number of discrete acts undertaken by the defendant but rather the aberrational character of the conduct); United States v. Patillo, 817 F.Supp. 839 (C.D. Cal. 1993)(aberrant behavior departure for first time offense, possession of 681 grams of crack, "out of character" for defendant, who had stable employment history and in a moment of "financial weakness" and "unusual temptation" and demonstration of "tremendous remorse"); United States v. Orrega, 363 F.3d 1093 (11th Cir. 2004)(aberrant behavior departure is not limited to "a single act that was spontaneous and seemingly thoughtless" as this "is overly restrictive and may preclude departures for aberrant behavior in circumstances in which such a departure might be warranted.")

2.    <u>Amount of Loss Compared to Defendant's Gain</u>

Mr. Lindor does not dispute that he is being held responsible for six foreclosures with a loss valued at approximately $180,000.  He fully accepts his responsibility for the loss amount and so stipulated in the Plea Agreement in this case.  However, "[w]here the loss determined...signficantly overstates the seriousness of the defendant's conduct, an upward or downward departure may be warranted."  <u>See</u> § 2F1.1, application note 8 (b).  There is no dispute that Mr. Lindor was paid $400 a week for his employment with ARC and received additional payments for fixing up homes for clients he referred.  Mr. Lindor had three jobs during the period of the conspiracy and did not profit substantially from this scheme.  Rather, he was a low-level employee that was taken advantage of by far more sophisticated men who made hundreds of thousands of dollars.  The Court should consider the fact that the amount of loss here substantially overstates Mr. Lindor's culpability in determining what is an appropriate sentence. <u>United States v. McBride</u>, 362 F.3d 360 (6th Cir. 2004); <u>United States v. Oligmueller</u>, 198 F.3d 669 (8th Cir. 1999); <u>United States v. Walters</u>, 87 F3d 663 (5th Cir. 1996); <u>United States v. Monaco</u>, 23 F.3d 793 (3d Cir. 1994); <u>United States v. Gregorio</u>, 956 F.2d 341 (1st Cir. 1992).

3.    <u>Time Served and Rehabilitation</u>

Mr. Lindor has already been incarcerated for almost one-month.  He ended up in the Special Housing Unit at the Federal Defense Center for two-weeks - on twenty-three hour a day lock-down without so much as a phone call.  Thereafter, he was housed at a county-jail facility in West Palm Beach.  The other defendants in this case

either served no jail time or did so in federal prison camps. Mr. Lindor has endured enough prison/jail time to ensure that he will never return to the criminal justice system. Since this matter was indicted Mr. Lindor has never been arrested or accused of another crime and has continued to work hard and provide moral, emotional and economic support for his family. Therefore, the Court should consider these facts in sentencing Mr. Lindor to a sentence that does not include an additional term of incarceration. See United States v. Redemann, 295 F. Supp. 2d 887, 896 (E. D. Wis. 2003)("For a defendant who faces more onerous conditions of confinement than the typical defendant, the court can impose a shorter prison sentence and obtain the same punitive effect... Similarly, where a defendant has rehabilitated himself, the court can impose a reduced sentence and still protect the public, thus satisfying the sentencing purpose of specific deterrence"); United States v. Brock,108 F.3d 31, 35 (4th Cir. 1997).

## IV.

## CONCLUSION

The Court now has the discretion to impose a sentence that it deems "reasonable" in light of the factors set forth in 18 U.S.C. § 3553(a). As stated, the advisory Guidelines range is one factor in making this determination. The Court must also consider the history and characteristics of Mr. Lindor, i.e., his reason for committing the crime, his level of culpability compared to the sentenced defendants, the sentences of other co-defendants, his lack of prior criminal history, his excellent employment record, his post-indictment rehabilitative conduct, and his family circumstances. See United States v. Gray, No. 05-30213 (11th Cir., June 28,

2006)(affirming a sentence that was less than half of the advisory Guidelines based on lack of criminal history, age, and medical condition); <u>United States v. Williams</u>, 435 F.3d 1350 (11th Cir. 2006)(holding that a sentence of less than half of the low end of the Guidelines was reasonable).  After considering each of the statutory factors, Mr. Lindor respectfully requests that the Court sentence him to a lengthy period of home-confinement and several years of supervised release or a split-sentence of incarceration and home-confinement.

Respectfully submitted,

/s/ Marc David Seitles

_____
Marc David Seitles
Fla. Bar No. 0178284

The Law Offices of Marc David Seitles, P.A.
Alfred I. duPont Building
169 East Flagler Street, Suite 1200
Miami, FL 33131
Tel: (305) 379-6667
Fax: (305) 379-6668
Email: mseitles@seitleslaw.com

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was delivered by fax this 7th day of March, 2007  to: Jeffrey, Assistant United States Attorney, 500 East Broward Blvd., 7th Floor, Fort Lauderdale, Florida 33301 and Sheila Tierney, United States Probation Officer, 501 S. Flagler Drive, Suite 400, West Palm Beach, FL 33401.

/s/ Marc David Seitles

_____
Marc David Seitles, Esq